UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

| | | |
|---|---|---|
| BRIARWOOD INVESTMENTS, INC., Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| | ) | CLASS ACTION |
| Plaintiff, | ) | |
| | ) | CLASS ACTION COMPLAINT |
| | ) | |
| vs. | ) | |
| | ) | |
| STIFEL FINANCIAL CORP., STIFEL, NICOLAUS & COMPANY, INC., and STIFEL BANK & TRUST, | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | JURY TRIAL DEMANDED |

By and through its undersigned counsel, Briarwood Investments, Inc. ("Plaintiff") brings this class action against defendants Stifel Financial Corp. ("Stifel"), Stifel, Nicolaus & Company, Inc. ("SN&C"), and Stifel Bank & Trust ("SB&T") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by Stifel with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants; and (d) news articles, websites, and other publicly available information concerning Defendants.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### SUMMARY OF THE ACTION

1.    Plaintiff brings this class action to recover damages arising out of Defendants' unlawful conduct related to Stifel's Automatic Cash Investment Service, which offers two automatic cash sweep programs, the Stifel Insured Bank Deposit Program and Stifel Insured Bank Deposit Program for Retirement Accounts.  Under these programs, Defendants sweep uninvested customer cash from customers' securities accounts into interest-bearing deposit accounts at banks affiliated with or otherwise selected by Defendants.

2.    The cash sweep accounts are highly lucrative for Defendants and Stifel's banks but pay unreasonably low interest rates to customers.  As such, Defendants use them to generate massive revenue for themselves at the expense of their customers.  In 2023, for example, Stifel reported that its banking unit earned an average of 6.08% interest on bank deposits, of which customer cash swept under Stifel's cash sweep programs represented an average of over $9 billion. In exchange for its access to customer cash, however, Stifel's banks paid rates of interest as low as 0.01%.  As a result, Stifel reported record net interest income of over $1 billion for the year.

3.      Defendants' use of their sweep programs to enrich themselves by paying unreasonably low interest rates to customers breached their fiduciary duties and contractual obligations and violated several state and federal laws including the Racketeer Influenced and Corrupt Organizations Act ("RICO Statute") and the Investment Advisers Act of 1940 ("Advisers Act").

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court also has subject matter jurisdiction under 18 U.S.C. §1964(c), 28 U.S.C. §1331, and 15 U.S.C. §80b-14 because Plaintiff brings claims arising under the RICO Statute, 18 U.S.C. §1962, and the Advisers Act, 15 U.S.C. §§80b-1-80b-21.

5.      This Court has personal jurisdiction over Defendants because, during the relevant time period, Defendants were incorporated in, had offices in, did sufficient business in, had sufficient contacts with, and intentionally availed themselves of the laws and markets of Missouri through the promotion, sale, marketing, distribution, and operation of their products and services.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because, during the relevant time period, Defendants were headquartered in, transacted business in, and had offices in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

7.      In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails and interstate telephone communications.

## PARTIES

**Plaintiff**

8.      Plaintiff Briarwood Investments, Inc. is a Delaware corporation headquartered in Valley Stream, New York.  During the relevant time period, Plaintiff held an individual brokerage account with Stifel.  Uninvested cash Plaintiff held in this accounts was swept into the banks that Defendants selected in their discretion at the unreasonably low interest rates alleged herein.

**Defendants**

9.      Defendant Stifel Financial Corporation is a Delaware corporation headquartered at 501 North Broadway, St. Louis, Missouri 63102.  Stifel is a financial services company that conducts business throughout the United States, with approximately $38.9 billion in assets and approximately 9,000 employees.  Stifel is the parent company and control person of SN&C and SB&T.

10.     Defendant Stifel, Nicolaus & Company, Inc. is a Missouri corporation headquartered at 501 North Broadway, St. Louis, Missouri 63102.  SN&C is a broker-dealer and a Registered Investment Advisor that offers brokerage and investment advisory services to its nationwide client base, with approximately $458 billion in assets under management.  During the relevant time period, SN&C acted as agent for the establishment, maintenance, and operation of the Defendants' cash sweep programs.  SN&C is a wholly owned subsidiary of Stifel.

11.     Defendant Stifel Bank & Trust is a Missouri-chartered bank and trust company and Member FDIC headquartered at 501 North Broadway, St. Louis, Missouri 63102.  During the relevant time period, SB&T acted as sub-custodian and sub-agent for the establishment, maintenance, and operation of the Defendants' cash sweep programs.  SB&T is a wholly owned subsidiary of Stifel.

## SUBSTANTIVE ALLEGATIONS

**Background on Defendants' Sweep Programs**

12.    Stifel is a publicly traded financial services firm.  During the relevant time period, Stifel's wholly owned subsidiary, SN&C, offered, and still offers, brokerage and investment advisory services to customers nationwide.  These services include the Stifel Automatic Cash Investment Service, which offers two automatic cash sweep programs called the Stifel Insured Bank Deposit Program ("IBD Program") and Stifel Insured Bank Deposit Program for Retirement Accounts ("RIBD Program") (collectively, "Sweep Programs").  The IBD Program sweeps cash from non-retirement accounts, while the RIBD Program sweeps cash from retirement accounts.

13.    The terms and conditions of the IBD Program and RIBD Program are set forth and incorporated in the Stifel Account Agreement and Disclosure Booklet ("Account Agreement"), which is posted on Stifel's public website.[1]  The Account Agreement is governed by Missouri state law.

14.    Under the IBD Program, SN&C automatically sweeps eligible clients' uninvested cash balances into interest-bearing deposit accounts ("Deposit Accounts") at a network of bank partners selected by the Defendants ("Sweep Banks").[2]  The participating Sweep Banks are listed on Priority Bank Lists, which are posted on Stifel's public website.[3]

---

[1]    Stifel, *Stifel Account Agreement and Disclosure Booklet*, https://www.stifel.com/docs/pdf/Disclosures/AgreementAndDisclosureBooklet.pdf  (last  visited Feb. 25, 2025).

[2]    *Id.* at 146.

[3]    Stifel, *Priority Bank Lists*, https://www.stifel.com/docs/pdf/Disclosures/SweepChoices/Priority-Bank-Lists/FDIC-Priority-Bank-List-20241209.pdf (Dec. 9, 2024).

15.    The Sweep Banks appear on the Priority Bank Lists in the order in which SN&C opens Deposit Accounts on behalf of its IBD Program clients.[4]  For example, the first Sweep Bank listed on the Priority Bank Lists represents the first Sweep Bank to which SN&C sweeps uninvested cash balances.  When deposits exceed the deposit limit of $246,500 for individuals (or $493,000 for joint accounts) at the first Sweep Bank, SN&C sweeps uninvested cash balances to the next Sweep Bank listed on the Priority Bank Lists.[5]

16.    For IBD Program clients, the Account Agreement states that up to four Sweep Banks on the Priority List will be affiliated with Stifel and SN&C, and that those affiliated banks may include SB&T, Stifel Bank, Stifel Trust Company, N.A., and Stifel Trust Company Delaware, N.A. (collectively, "Affiliated Banks").[6]

17.    Since October 3, 2022, the Affiliated Banks have been the first four Sweep Banks on the Priority Bank Lists for all IBD Program clients.[7]  In other words, the first $986,000 of uninvested cash balances have since been, and continue to be, swept into Deposit Accounts at the Affiliated Banks.

18.    When uninvested cash balances exceed the deposit limits at the Affiliated Banks, SN&C opens Deposit Accounts at unaffiliated banks and, in the order appearing on the Bank Priority Lists, deposits uninvested cash balances in Deposit Accounts at the unaffiliated banks up to the deposit limits stated above.[8]  In the event that all the Sweep Banks receive funds up to the

---

[4]    Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1, at 147.

[5]    *Id.* at 146-47.

[6]    *Id.* at 146.

[7]    *See* Stifel, *FDIC Historical Bank Lists*, https://www.stifel.com/disclosures/sweep-choices/historical-bank-lists (last visited Mar. 4, 2025).

[8]    Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 146.

deposit limit, the excess customer cash is swept into "Excess Banks" chosen by Defendants. The Excess Banks accept funds "without limit and without regard to the FDIC insurance limit."[9]

19.    The Account Agreement provides that SN&C acts as an agent for customers in the IBD Program, stating, *inter alia*, that SN&C "is acting as [the customer's] agent in establishing and as [the customer's] custodian in holding the Deposit Accounts at each Bank, depositing funds into the Deposit Accounts, withdrawing funds from the Deposit Accounts, and transferring funds among the Deposit Accounts."[10]

20.    The Account Agreement additionally provides that SB&T acts as agent for customers in the IBD Program, stating that SN&C uses SB&T as a "sub-custodian – an agent to establish the Deposit Accounts at the Banks for [SN&C] – and to settle the deposit and withdrawal transactions with the Banks each business day."[11]

21.    The Account Agreement states that the Sweep Banks participating under the IBD Program each "pay the same rate of interest on the Deposit Accounts within each Interest Rate Tier," that the rates of interest are "determined by the amount the Banks are willing to pay on the Deposit Accounts minus the fees paid to Stifel and other parties," and that the rates of interest "may change daily."[12]

---

[9]    *Id.* at 148.

[10]    *Id.* at 151.

[11]    *Id.*

[12]    *Id.* at 149.

22.    Under the RIBD Program, SN&C automatically sweeps retirement clients' uninvested cash balances into FDIC-insured Deposit Accounts at Affiliated Banks.[13]  The RIBD Program does not sweep uninvested cash balances into Deposit Accounts at unaffiliated banks.

23.    The Bank Priority Lists reflect the order in which SN&C sweeps uninvested retirement cash into the Affiliated Banks.  For example, the first Affiliated Bank on the Priority Bank List for retirement clients represents the first Affiliated Bank to which SN&C sweeps uninvested cash balances.  When retirement client deposits exceed the deposit limit of $246,500 for individuals at the first Affiliated Bank, SN&C sweeps uninvested cash balances to the next Affiliated Bank listed on the Priority Bank List.[14]

24.    When retirement-client deposits exceed $986,000 (the total of the deposit limits at the four Affiliated Banks), the excess cash is swept into Excess Banks chosen by Stifel.  The Excess Banks accept retirement customer deposits "without limit and without regard to the FDIC insurance limit."[15]

25.    The Excess Banks under the RIBD Program are the same Affiliated Banks to which retirement-client cash is swept until the total deposits exceed $986,000.[16]

26.    The Account Agreement provides that SN&C acts as an agent for customers in the RIBD Program, stating, *inter alia*, that SN&C "is acting as [the customer's] agent in establishing and as [the customer's] custodian in holding the Deposit Accounts at each Bank, depositing funds

---

[13]    *Id.* at 153.

[14]    *Id.*; *see also* Stifel, *Priority Bank Lists*, *supra* note 3.

[15]    Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 155.

[16]    Stifel, *Priority Bank Lists*, *supra* note 3.

into the Deposit Accounts, withdrawing funds from the Deposit Accounts, and transferring funds among the Deposit Accounts."[17]

27.    In addition, the Account Agreement states that the Affiliated Banks each "pay the same rate of interest on the Deposit Accounts," that the rates of interest on deposits in the RIBD Program are "determined by the amount the Banks are willing to pay on the Deposit Accounts minus the fees paid to Stifel and other parties," and that the rates of interest "may change daily."[18]

28.    Participants in the Sweep Programs included clients investing through advisory accounts with SN&C.

**Defendants Reaped Significant Benefits from Their Sweep Programs to the Detriment of Customers, Who Were Paid Unreasonably Low Interest Rates**

29.    The Sweep Programs provide several highly lucrative financial benefits to Defendants and their Affiliated Banks.  ***First***, the Affiliated Banks receive substantial deposits "at a price that may be less than other alternative funding sources available to them."[19]  These deposits "provide a stable source of funds for the Affiliated Banks," which the Affiliated Banks use "to support a variety of activities, including, but not limited to, each of their lending activities, if any."[20]  In fact, as Stifel reported in its 2024 Form 10-K, bank deposits represent its "largest funding source," and those deposits "are ***primarily sourced*** by [its] multi-bank sweep program in

---

[17]    Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 158.

[18]    *Id.* at 157.

[19]    *Id.* at 151, 159.

[20]    *Id.*

which clients' cash deposits in their brokerage accounts are swept into FDIC-insured interest-bearing accounts at [its] bank subsidiaries and various third-party banks."[21]

30.    **Second**, Stifel's wholly owned subsidiaries, SN&C and SB&T, earn fees from the Sweep Programs. Under both Sweep Programs, SN&C "receives an aggregate, annual fee of up to $100 from the Affiliated Banks" for each participating securities account.[22]  In addition, under the IBD Program, unaffiliated banks pay SB&T "as much as 7.00 percent annually on balances in the Deposit Accounts."[23]  The Account Agreement gives SB&T discretion to set or reduce the fee paid by each unaffiliated bank.[24]

31.    **Third**, and relatedly, SB&T receives additional bank deposits under reciprocal deposit arrangements with the unaffiliated banks.  Under these arrangements, SB&T receives and accepts deposits from customers of the unaffiliated banks in amounts similar or equal to univested customer cash deposited into Deposit Accounts under the IBD Program.  This provides the Affiliated Banks with an additional stable source of funding "at a price that may be less than other alternative funding sources available to them."[25]

32.    Defendants were able to maximize their financial gain and their Affiliated Banks' financial gain from the Sweep Programs by automatically enrolling customers in the Sweep Programs and paying unreasonably low rates.  At the same time, Defendants guaranteed their

---

[21]  Stifel Financial Corp., Annual Report (Form 10-K) (Feb. 26, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000720672/000095017025027702/sf-20241231.htm (emphasis added).

[22]  Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 151, 159.

[23]  *Id.* at 151.

[24]  *Id.*

[25]  *Id.*

Affiliated Banks always paid lower rates of interest on uninvested customer cash than the unaffiliated banks because of their placement as the first four Sweep Banks on the Priority Bank Lists.

33.    As an illustrative example, the following image[26] lists the deposit priority, effective December 9, 2024, for uninvested cash of customers located in Alabama, Arkansas, Florida, Georgia, Louisiana, Missouri, Mississippi, North Carolina, South Carolina, Tennessee, and Texas:

**List 1 (AL, AR, FL, GA, LA, MO, MS, NC, SC, TN, TX)**

| Position | Bank | City | State |
|---|---|---|---|
| 1 | Stifel Bank & Trust | St. Louis | MO |
| 2 | Stifel Bank | St. Louis | MO |
| 3 | Stifel Trust Company, N.A. | St. Louis | MO |
| 4 | Stifel Trust Company Delaware, N.A. | Wilmington | DE |
| 5 | Bank of New York Mellon | Pittsburgh | PA |
| 6 | Associated Bank, N.A. | Green Bay | WI |
| 7 | Wells Fargo Bank, N.A. | Sioux Falls | SD |
| 8 | EagleBank | Bethesda | MD |
| 9 | Farmers and Merchants Bank | Milford | NE |
| 10 | Bank of East Asia, Ltd. | New York | NY |
| 11 | Capital One, National Association | Glen Allen | VA |
| 12 | UMB Bank National Association | Kansas City | MO |
| 13 | Metro City Bank | Doraville | GA |
| 14 | Pinnacle Bank | Nashville | TN |
| 15 | US Bank National Association | Cincinnati | OH |
| 16 | Barclays Bank Delaware | Wilmington | DE |
| 17 | Deutsche Bank Trust Company | New York | NY |

By placing the Affiliated Banks at the top of the Bank Priority Lists, Stifel ensures its Affiliated Banks pay as low as 0.01% and not greater than 0.25% interest. Meanwhile, because of their position on the Bank Priority Lists, the unaffiliated banks generally pay rates of interest of 1.00% or greater.

34.    These circumstances created an admitted "conflict of interest" because "the profitability of the Affiliated Banks is determined in large part by the difference between the interest paid and other costs incurred by it on its deposit amounts (including amounts held through

---

[26]    Stifel, *Priority Lists*, *supra* note 3 at 1.

the Deposit Accounts), and the interest or other income earned on its loans, investments, and other assets."[27]

35.     Due to this adverse financial incentive, Defendants failed to pay, negotiate, and secure reasonable sweep interest rates for customers in the Sweep Programs.  As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

36.     The United States Department of Labor defines a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[28]

37.     Similarly, the U.S. Internal Revenue Service defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[29]  Thus, an interest rate is reasonable if it is based on a fair market valuation.

38.     In contrast, the Sweep Programs paid miniscule, below-market interest rates as low as 0.01%, depending on the amount of uninvested idle cash to be deposited on the client's behalf.[30] These rates were ***significantly*** below several objective benchmarks of reasonableness:

---

[27]   Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 151-52, 159.

[28]   Grant of Individual Exemptions; Deutsche Bank AG, 68 Fed. Reg. 34646 (June 10, 2003).

[29]   26 C.F.R. §1.482-2(a)(2).

[30]   Stifel, *Stifel Insured Bank Deposit Programs: Interest Rate Tiers for the Stifel Insured Bank Deposit Program* (Feb. 3, 2025), https://www.stifel.com/docs/pdf/disclosures/SweepChoices/FDIC%20Insured%20Bank%20Deposit%20Program%20RatesTiers.pdf.  The current annual percentage yields are 0.01% for Tier 1 (<$100,000), 0.10% for Tier 2 ($100,000 to <$250,000), 0.15% for Tier 3 ($250,000 to

- **Competitors' Deposit Accounts**. Defendants' sweep interest rates were far below fair market value, as demonstrated by the rates paid by their competitors. According to the FDIC, the national rate of interest paid by money market deposit products offered by insured depository institutions and credit unions currently averages 0.64%.[31] Moreover, competitors offering FDIC-insured sweep accounts similar to those in the Sweep Programs pay even higher rates. For example, competitor Webull's rate is 3.75%,[32] Vanguard's rate is 3.65%,[33] Fidelity's rate is 2.21%,[34] and Robert W. Baird's rate is between 1.45% and 2.89%.[35]

- **Other Interest-Bearing Accounts Offered by Defendants**. Further, the sweep interest rates paid by the Sweep Programs were far lower than the interest rates paid by other products offered by Defendants outside of the Sweep Programs. For example, Stifel's FDIC-insured "Smart Rate Program," which makes available a money market deposit account at the Affiliated Banks, currently offers a rate of 3.85% on deposits of $100,000 or more.[36] By contrast, under the Sweep Programs,

---

<$500,000), 0.25% for Tier 4 ($500,000 to <$1M), 1.00% for Tier 5 ($1M to <$2M), and 1.50% for Tier 6 ($2M+).

[31] Federal Deposit Insurance Corporation, *National Rates and Rate Caps* (Feb. 18, 2025), https://www.fdic.gov/national-rates-and-rate-caps. The FDIC defines the national rate of interest as "the average of rates paid by all insured depository institutions and credit unions for which data is available, with rates weighted by each institution's share of domestic deposits." *Id.* Informa Research Services, a company that specializes in compiling business data, also found that FDIC-insured United States banks consistently pay significantly higher interest rates than Defendants on deposit accounts, including average rates ranging from 0.19% to 0.36% from August 2017 through March 2019.

[32] Webull, *Webull High-Yield Case Management*, https://www.webull.com/cash-management (last visited Mar. 3, 2025).

[33] Vanguard, *Earn 3.65% APY with the Vanguard Cash Plus Account*, https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last visited Mar. 3, 2025).

[34] Fidelity, *Fidelity Cash Management Account*, https://digital.fidelity.com/prgw/digital/fdic-interest-rate/fcma (last visited Mar. 3, 2025).

[35] Baird, *Cash Sweep Program*, https://www.rwbaird.com/cashsweeps/ (last visited Mar. 3, 2025).

[36] Stifel, *Efficient Cash Management – Stifel Smart Rate Program*, https://www.stifel.com/docs/pdf/Individuals/CashManagement_IntroducingSmartRate.pdf (last visited Mar. 4, 2025); *see also* Stifel, *Smart Rate Program Disclosure*, https://www.stifel.com/docs/pdf/disclosures/Smart%20Rate%20Program%20Disclosure.pdf (last visited Mar. 4, 2025) ("Through the Stifel Smart Rate Program [SN&C] makes available to its eligible clients a deposit account ('Deposit Account') issued by one of the [Affiliated Banks]

the Affiliated Banks pay rates of interest as low as 0.10% on deposits of $100,000 or more.

- **Federal Funds Rate**.  The sweep interest rates in the Sweep Programs were also far below the U.S. Federal Reserve's benchmark federal funds rate, currently at 4.25% to 4.50%.[37]

- **Treasury Bill Rates**.  The sweep interest rates in the Sweep Programs were far below U.S. Treasury bill rates, including the three-month and one-year rates currently at 4.20% and 3.95%, respectively.[38]

- **Repurchase Rate**.  The sweep interest rates in the Sweep Programs were well below the overnight interest rate at which the U.S. Federal Reserve repurchases securities from private banks (*i.e.*, the repo rate), which is currently 4.25%.[39]

39.    These benchmarks individually and collectively demonstrate that Defendants' sweep interest rates have been, and remain, unreasonable.  Indeed, though Stifel has claimed its sweep rates are "generally impacted by the level of short-term interest rates," among other factors, the sweep rates paid by its Affiliated Banks have ***declined*** in the face of increasing short-term interest rates.[40]  For example, on July 28, 2022, the Sweep Programs paid 0.15% on deposits up to $99,999, 0.30% on deposits between $100,000 and $249,999, 0.45% on deposits between

---

whose deposits are insured by the Federal Deposit Insurance Corporation ('FDIC'). Each Deposit Account is a money market deposit account ('MMDA'), a type of savings account.").

[37] Federal Reserve, *Economy at a Glance – Policy Rate* (Jan. 30, 2025), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.

[38]  Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis* (Feb. 27, 2025), https://fred.stlouisfed.org/series/DTB3; Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis* (Feb. 27, 2025), https://fred.stlouisfed.org/series/DTB1YR.

[39]  Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate: Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations* (Feb. 28, 2025), https://fred.stlouisfed.org/series/RRPONTSYAWARD.

[40]  Stifel Financial Corp., Annual Report (Form 10-K) (Feb. 26, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000720672/000095017025027702/sf-20241231.htm.

$250,000 and $499,999, and 0.65% on deposits between $500,000 and $999,999.[41]  On that same day, the Federal Reserve's benchmark federal funds rate was 2.25% to 2.5%.[42]  Despite a marked increase in the benchmark federal funds rate, Stifel now pays far lower rates of interest on all sweep deposits below $1,000,000.

40.    As further evidence of the unreasonableness of the sweep rates, at least two of Stifel's Affiliated Banks, SB&T and Stifel Bank, participate as program banks in the sweep programs of Stifel's competitors and pay competitors' customers higher rates of interest.  For example, SB&T and Stifel Bank are Program Banks for Edward Jones' sweep program, which pays rates of interest ranging from 0.45% to 2.05%.[43]  Meanwhile, for its own customers, Stifel's Affiliated Banks pay meager rates of interest as low as 0.01%.

41.    In addition, some of Stifel's competitors use some of the same unaffiliated banks on the Bank Priority Lists.  But those same banks pay far higher rates to customers of Stifel's competitors than they do to Stifel's customers. For example, Vanguard's bank sweep option sweeps idle customer cash into money market deposit accounts at a host of Program Banks, including Wells Fargo Bank, N.A., which pay Vanguard customers rates of interest of 2.75%.[44]

---

[41]  Stifel, *Interest Rates for the Stifel Insured Bank Deposit Programs* (effective July 28, 2022), https://web.archive.org/web/20220812220611/https://www.stifel.com/docs/pdf/disclosures/SweepChoices/FDIC%20Insured%20Bank%20Deposit%20Program%20RatesTiers.pdf.

[42]  Federal Reserve, *Economy at a Glance – Policy Rate* (July 28, 2022), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.

[43]  Edward Jones, *Edward Jones Insured Bank Deposit List of Program Banks for Personal Accounts* (Feb. 28, 2025), https://www.edwardjones.com/sites/default/files/acquiadam/2023-07/LGL-8812BF-A-1.pdf; Edward Jones, *Insured Bank Deposit Program* (rates effective Dec. 31, 2024), https://www.edwardjones.com/us-en/investment-services/account-options/cash-credit/savings-accounts/insured-bank-deposit.

[44]  Vanguard, *Vanguard Cash Deposit*, https://investor.vanguard.com/investment-products/vanguard-cash-deposit (last visited Mar. 10, 2025); Vanguard, *Vanguard Bank Sweep*

- 14 -

Wells Fargo Bank, N.A., which appears on various Priority Bank Lists for the IBD Program, pays Stifel customers 1.50%, at most.

42.     As a result, Plaintiff and the Class (defined below) suffered, and continue to suffer, damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

**Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to Their Sweep Programs**

43.     Under the Account Agreement, SN&C agreed to act as its customers' agent in connection with the Sweep Programs.  As agent, SN&C exercised discretion and control over cash deposited into the Sweep Programs, selected the Sweep Banks, coordinated with the Sweep Banks to set interest rates, and swept customers' cash into the Sweep Banks.

44.     In addition, under the Account Agreement, SB&T agreed to act as sub-agent to SN&C in connection with the IBD Program.  As sub-agent, SB&T established the Deposit Accounts, settled deposit and withdrawal transactions at the banks, exercised discretion over the fees it accepted in exchange for customer cash, and otherwise exercised control over the cash deposited into the Sweep Programs.

45.     SN&C and SB&T, as agents under the Account Agreement, were contractually obligated to act in their customers' best interests in seeking and negotiating reasonable interest rates under the Sweep Programs.  In other words, reasonableness was implicit in the Account Agreement and governed the sweep interest rates paid to customers under the Sweep Program.

46.     Defendants violated these contractual duties by failing to pay, negotiate, and secure reasonable interest rates under both the IBD Program and RIBD Program, as discussed above.

---

*Program        Bank        List* (Aug.        2024), https://personal1.vanguard.com/pdf/Bank_Sweep_Participating_Banks.pdf.

47.     Defendants also violated their contractual duties to provide reasonable rates of return on their customers' retirement account balances pursuant to the Internal Revenue Code ("IRC") and Employee Retirement Income Security Act of 1974 ("ERISA"), which were incorporated into Program Documents governing retirement accounts.  The "Retirement Account Addendum" to the Account Agreement, for example, stated that the Deposit Accounts under the RIBD Program "w[ould] bear a ***reasonable rate of interest*** as required under the exemption provided by ERISA Section 408(b)(4) or [IRC] Section 4975(d)(4), which permits the investment of retirement client assets in deposits of affiliated banks."[45]

48.     Summarizing IRC rules concerning IRAs, IRS Publication 590 states that "disqualified persons include your fiduciary," such as anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets," and that "prohibited transaction[s]" are "any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person."[46]

49.     Section 4975 of the IRC states that "prohibited transaction[s]" involving a retirement plan include any direct or indirect "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan"; "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account"; or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving

---

[45]   Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 165 (emphasis added).

[46]   Department of the Treasury, Internal Revenue Service, *Distributions from Individual Retirement Arrangements (IRAs)*, Publication 590-B (Mar. 12, 2024), https://www.irs.gov/pub/irs-pdf/p590b.pdf.

the income or assets of the plan.'"[47] A "disqualified person" under Section 4975 of the IRC includes a "fiduciary" and "a person providing services to the [retirement] plan."[48]

50.　　Therefore, SN&C was a "disqualified person" under Section 4975 of the IRC because it was a fiduciary and service provider of retirement account customers in connection with the RIBD Program. Because it was a disqualified person, cash sweeps from retirement accounts to the Affiliate Banks, for the benefit of Defendants and the Affiliate Banks, were "prohibited transactions" under Section 4975 of the IRC.

51.　　The IRC provides limited "exemptions" to prohibited transactions under Section 4975, including "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution."[49] However, cash sweeps under the RIBD Program was not exempt because the Affiliated Banks did not pay reasonable sweep interest rates, as discussed above.

52.　　Similarly, Section 408 of ERISA exempts interested party transactions involving the investment of retirement account assets in bank deposits only if they "bear a reasonable interest rate."[50] This exemption did not apply because the Affiliated Banks did not pay reasonable sweep interest rates.

---

[47]　26 U.S.C. §4975(c)(1)(D)-(F).

[48]　26 U.S.C. §4975(e)(2)(A)-(B).

[49]　26 U.S.C. §4975(d)(4) (emphasis added). Department of the Treasury regulations confirm that, under the IRC, investing retirement plan assets in deposits in a disqualified bank is exempted only if the deposits "bear[] a reasonable rate of interest" and, "in the case of a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization must name the institution and "state that [it] . . . may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." 26 C.F.R. §54.4975-6(b)(1), (3).

[50]　29 U.S.C. §1108(b)(4).

53.    Thus, Defendants' cash sweeps from retirement accounts violated the IRC, ERISA, and the contractual provisions of the Account Agreement that incorporated the IRC and ERISA.

54.    In addition to its contractual obligations, as an investment adviser, SN&C owed fiduciary duties to its clients under the Advisers Act.[51]  In particular, SN&C was obligated to "serve the best interest of its client and not subordinate its client's interest to its own" and were not permitted to "place its own interests ahead of the interests of its client."[52]

55.    SN&C acted as an "investment adviser" in connection with the Sweep Programs because it accepted special compensation in exchange for investment advice.  The Account Agreement states that SN&C "considers Securities Account participation in the Program and the Program deposits as part of its overall compensation."  In addition, the Account Agreement consistently calls the automatic deposits it makes under the Sweep Programs "investments."  For instance, the Account Agreement (a) defines "Sweep Option" to mean "an investment option offered as part of the Cash Investment Service for the automatic investment of available cash balances . . . in a Securities Account"; (b) refers to both Sweep Programs together as Stifel's "Cash Investment Service" or "Automatic Cash Investment Service"; and (c) calls the Sweep Programs an "investment option."  Finally, the Sweep Programs allowed SN&C to exercise full managerial discretion over customer cash, including by unilaterally choosing the participating Sweep Banks, setting the rates of interest and rate tiers, and deciding the order in which the Sweep Banks received customer cash.

---

[51]    *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019) (interpreting Section 206 of the Advisers Act, 15 U.S.C. §80b-6).

[52]    *Id.*

56.    As their customers' agents in connection with the Sweep Programs, SN&C and SB&T owed similar duties of care under common law and under Regulation Best Interest, which required them to act in their retail customers' best interests and prohibited them from placing their own interests ahead of their retail customers' interests.[53]

57.    Further evidencing the fiduciary duties undertaken by SN&C and SB&T, the Account Agreement defines a "Fiduciary" to mean "an administrator, trustee, conservator, custodian, executor, general partner, officer, personal representative, or other similar person who has a relationship of trust and confidence with, and a duty to act primarily for the benefit of, the equitable owner of the assets of a Securities account, including a fiduciary of an ERISA plan." By acting as agent and custodian for customers in connection with the Sweep Programs, SN&C and SB&T owed a duty to act in their customers' best interests.

58.    However, as discussed above, Defendants violated these fiduciary duties under the Advisers Act, Regulation Best Interest, Account Agreement, and common law by failing to act in their customers' best interests, and by placing their own interests ahead of their customers' interests, when they enriched themselves by providing customers in the Sweep Programs with unreasonably low interest rates that were well below several objective benchmarks discussed above.

59.    SN&C also violated the Advisers Act by employing the Sweep Programs scheme to deceive, defraud, and manipulate customers. SN&C coordinated with the Sweep Banks to pay unreasonably low interest rates to customers in the Sweep Programs in order to maximize Defendants' and the Sweep Banks' financial benefits from the Sweep Programs. To conceal this scheme, Defendants intentionally deceived, defrauded, and manipulated customers in the Sweep

---

[53]    *See* Securities and Exchange Commission, Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

Programs by making materially false and misleading statements and omissions about the Sweep Programs (discussed further below) in the Account Agreement posted on Stifel's public website and distributed to customers throughout the country.

**Defendants Made Material Misrepresentations and Omissions Regarding Their Sweep Programs**

60.    In the Account Agreement, Defendants made material omissions by failing to disclose that, as discussed above, Defendants established and used the Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers in order to increase their financial benefits.

61.    The Account Agreement also misleadingly stated that Stifel "requir[es] the use" of the Sweep Programs and offers the Sweep Programs as "the sole option" for eligible accounts.[54] In addition, the Terms and Conditions of the Sweep Programs, as set forth in the Account Agreement, misleadingly state the following:

> **Termination of the Cash Investment Service.**  You understand that the Cash Investment Service feature will automatically terminate if for any reason your Securities Account is closed or transferred to another financial institution. Stifel at its discretion may terminate the Cash Investment Service at any time, with or without notice, all without any liability therefor.

These statements were misleading and omitted material facts because, in reality, (a) Stifel offered customers the option to terminate their participation in the Sweep Programs[55] and (b) Stifel offered other cash management options, including its "Smart Rate Program," which "keeps [customers'] cash balances at Stifel affiliated banks through [their] securities account[s]" and pays a rate of interest of 3.85% to customers who deposit a minimum of $100,000, or a ***3750% increase*** from

---

[54]    Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 147, 154.

[55]    *Id.* at 151, 158.

the rate of interest (0.10%) paid on deposits between $100,000 and $250,000 held at Affiliated Banks under the Sweep Programs.[56]

62.    The Account Agreement also misleadingly stated: (a) "The Banks **do not generally** offer the highest rates available or rates comparable to money market mutual fund ('Money Fund') yields.";[57] (b) "The interest rates paid with respect to the Deposit Accounts at a Bank **may be higher or lower** than the interest rates available to depositors making deposits directly with a Bank or other depository institutions in comparable accounts and for investments in money market funds and other cash equivalent investments available through Stifel.";[58] and (c) "[T]he Affiliated Banks receive substantial deposits . . . at a price that **may be less than other alternative funding sources available to them**."[59]  These statements were misleading and omitted material facts because, in reality, the Sweep Programs **always** offered rates of interest significantly below market alternatives, and the Sweep Banks accordingly **always** received substantial deposits at a price significantly below other alternative funding sources.

63.    In addition, the Account Agreement's Retirement Account Addendum stated that the Deposit Accounts under the RIBD Program "w[ould] bear a **reasonable rate of interest** as required under the exemption provided by ERISA Section 408(b)(4) or [IRC] Section 4975(d)(4),

---

[56]  *See also* Stifel Financial Corp., Annual Report (Form 10-K) (Feb. 16, 2024), at 8, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000720672/000095017024016475/sf-20231231.htm ("We utilize [money market mutual] funds sponsored by third parties in limited circumstances for our own investment purposes as well as to offer our clients as one of **several cash sweep alternatives**.") (emphasis added).

[57]  Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 147, 154 (emphasis added).

[58]  *Id.* at 149, 157 (emphasis added).

[59]  *Id.* at 151, 159 (emphasis added).

which permits the investment of retirement client assets in deposits of affiliated banks."[60]  This statement was misleading and omitted material facts because, in reality, SN&C was coordinating with Affiliated Banks to pay unreasonably low interest rates in order to increase the financial benefits realized by Stifel and SN&C from the RIBD Program.

64.    Moreover, Defendants' statements about potentially *lower* interest rates did not excuse their contractual and fiduciary obligations to pay *reasonable* interest rates, as described above.  These statements must be construed harmoniously with Defendants' contractual and fiduciary obligations.

**Defendants Violated the RICO Statute**

65.    Defendants violated the RICO Statute through their implementation of the Sweep Programs.

66.    SN&C, SB&T, and the other Sweep Banks were an "enterprise" within the meaning of the RICO Statute.  Through SN&C, SB&T, and the other Sweep Banks, Defendants knowingly and intentionally devised and operated the Sweep Programs as a scheme to defraud customers, including Plaintiff and the Class (defined below).  Defendants used the Sweep Programs to benefit and enrich themselves by coordinating with the Sweep Banks to pay unreasonably low interest rates to customers on money deposited into the Sweep Programs and making false and misleading statements and omissions relating to such interest rates.

67.    The Sweep Programs involved commercial activities across state lines, including Defendants' distribution of the Account Agreement to customers, and Defendants' receipt and transfer of money deposited by customers.

---

[60]    Stifel, *Account Agreement and Disclosure Booklet*, *supra* note 1 at 165 (emphasis added).

68.     Through the Sweep Programs, Defendants conducted and participated in a pattern of racketeering activity within the meaning of the RICO Statute ("Racketeering Acts"). Defendants' Racketeering Acts included indictable, predicate offenses under 18 U.S.C. §§1341 and 1343 based on Defendants' fraudulent use of interstate mail and wire communications. Defendants orchestrated a scheme to intentionally defraud customers by coordinating with the Sweep Banks to pay unreasonably low interest rates to customers in the Sweep Programs, and by concealing the scheme through the materially false and misleading Account Agreement posted on Stifel's public website of Stifel and distributed to customers throughout the country.

69.     The Racketeering Acts were related in that they were taken in furtherance of Defendants' Sweep Programs scheme.  The Racketeering Acts occurred, and continue to occur, regularly and continuously over a multi-year period during the operation of the Sweep Programs.

70.     Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Programs scheme, including posting the materially false and misleading Program Documents on the public website of Stifel and distributing them to customers throughout the country.

71.     As customers of the Sweep Programs, Plaintiff and the Class (defined below) were damaged by Defendants' Racketeering Acts due to Defendants' payment of unreasonably low interest rates on the money customers deposited into the Sweep Programs.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action against Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all Stifel customers who had cash deposits or balances in the Sweep Programs.  Excluded from the Class are Defendants,

officers and directors of Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

73.    The Class members are so numerous that their individual joinder is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, and are geographically dispersed, because Stifel oversees approximately $510 billion in client assets worldwide.

74.    Plaintiff's claims are typical of Class members' claims because Plaintiff's cash deposits were subject to the Sweep Programs, and, therefore, Plaintiff's claims, and those of all other Class members, arose from the same wrongful conduct by Defendants alleged herein.

75.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in complex class action litigation.  Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

76.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Class members who were not parties to the adjudications or would substantially impair or impede the ability of such Class members to protect their interests.

77.    Because Defendants act or refuse to act on grounds that apply generally to the Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

79.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants act on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the laws as alleged herein;

(b)     whether SN&C and SB&T owed fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(c)     whether SN&C and SB&T breached their fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(d)     whether SN&C and SB&T breached their contractual obligations to Plaintiff and members of the Class in connection with the Sweep Programs;

(e)     whether Defendants violated the Advisers Act;

(f)     whether Defendants violated the RICO Statute;

(g)     whether Defendants made material misrepresentations and/or omissions in connection with the Sweep Programs;

(h)     whether Defendants were unjustly enriched by their wrongful conduct;

(i)     whether the members of the Class sustained damages as a result of the alleged wrongful conduct by Defendants, and, if so, the appropriate measure of damages; and

(j)      whether the members of the Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

## COUNT I

## BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS

80.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

81.     During the relevant time period, SN&C was the agent of, and investment advisors to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  Stifel owned and controlled SN&C.

82.     During the relevant time period, SB&T was the agent of customers enrolled in the IBD Program, including Plaintiff and members of the Class.  Stifel owned and controlled SB&T.

83.     SN&C and SB&T owed fiduciary duties to Plaintiff and the Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Class.

84.     SN&C and SB&T violated their duties to act in the best interests of Plaintiff and the Class by using the Sweep Programs to enrich themselves, Stifel, and the other Sweep Banks at the expense of customers who were paid unreasonably low interest rates, as described above.

85.     SN&C also violated its duties to deal fairly and honestly with Plaintiff and the Class by making material misrepresentations and omissions in the Account Agreement, as described above.

86.     Further, SN&C violated its duties to act with reasonable care to verify the truthfulness of the information set forth in the Account Agreement, which was materially misleading and omitted material facts for the reasons described above.

87.     As a direct and proximate result of SN&C's and SB&T's breaches of fiduciary duties, Plaintiff and the Class suffered damages and are entitled to recover such damages from Defendants.

## COUNT II

### VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940 AGAINST DEFENDANTS STIFEL AND SN&C

88.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

89.    During the relevant time period, SN&C was registered as an investment adviser under the Advisers Act and acted as an agent with full discretion, management, and control over cash deposited by customers into the Sweep Programs.  SN&C selected the Sweep Banks that received deposits, coordinated with the Sweep Banks to set interest rates on the deposits, and swept the deposits into the Sweep Banks.  Stifel owned and controlled SN&C.

90.    SN&C violated Section 206 of the Advisers Act through its operation of the Sweep Programs.  Under Section 206 of the Advisers Act, SN&C was obligated to "serve the best interest of its client and not subordinate its client's interest to its own" and was not permitted to "place its own interests ahead of the interests of its client."   Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019); 17 C.F.R. §275.206(4)-7.  SN&C failed to serve the best interests of its clients, and placed its own interests ahead of its clients' interests, by paying unreasonably low interest rates to clients in the Sweep Programs for the purpose of increasing Stifel's, SN&C's, and the Sweep Banks' financial benefits from the Sweep Programs.

91.    Section 206 of the Advisers Act also prohibits any investment adviser from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, "to employ any device, scheme, or artifice to defraud any client or prospective client"; "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client"; or "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."  15 U.S.C. §80b-6(1)-(2), (4).  SN&C violated Section 206 of the Advisers Act through its fraudulent Sweep Programs scheme, whereby SN&C coordinated with

the Sweep Banks to pay unreasonably low sweep interest rates to clients in order to maximize Stifel's, SN&C's, and the Sweep Banks' financial benefits from the Sweep Programs. To conceal the scheme, Stifel and SN&C intentionally deceived, defrauded, and manipulated clients by making materially false and misleading statements and omissions (discussed above) about the Sweep Programs in the Account Agreement posted on Stifel's public website and distributed to customers throughout the country.

92.     As a result of these violations, the Account Agreement should be deemed void pursuant to Section 215(b) of the Advisers Act, which provides that every:

> contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

93.     Accordingly, Plaintiff seeks rescission of the Account Agreement and restitution of the consideration given pursuant to their purported terms.

## COUNT III

## BREACH OF CONTRACT AGAINST DEFENDANTS STIFEL AND SN&C

94.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

95.     Plaintiff and Class members were parties to the Account Agreement with SN&C and/or Stifel. The Program Documents set forth the contractual terms and conditions of the Sweep Programs. Stifel owned and controlled SN&C.

96.     Pursuant to the Account Agreement, SN&C was contractually obligated to act as agent on behalf of Plaintiff and the Class, and, thus, was contractually obligated to act in Plaintiff's

and the Class' best interests in seeking and negotiating reasonable sweep interest rates under the Sweep Programs.

97. SN&C breached its contractual obligations by failing to provide Plaintiff and the Class with reasonable interest rates on their deposits in the Sweep Programs. Rather, the sweep interest rates provided by SN&C were below market and unreasonably low. As such, SN&C denied Plaintiff and the Class the full benefit of their bargain under the Account Agreement.

98. As a direct and proximate result of SN&C's breach of contract, Plaintiff and the Class sustained damages.

## COUNT IV

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS STIFEL AND SN&C

99. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

100. Plaintiff and Class members were parties to the Account Agreement with SN&C and/or Stifel. The Account Agreement set forth the contractual terms and conditions of the Sweep Programs. Stifel owned and controlled SN&C.

101. Implicit in the Account Agreement were duties of good faith and fair dealing.

102. SN&C and Stifel breached their duties of good faith and fair dealing by failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs. Rather, the interest rates provided by SN&C and Stifel were below market and unreasonably low. As such, SN&C and Stifel denied Plaintiff and the Class the full benefit of their bargain under the Account Agreement.

103. As a direct and proximate result of SN&C's and Stifel's breaches of the implied covenants of good faith and fair dealing, Plaintiff and the Class sustained damages.

## COUNT V

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(c)-(d), AGAINST ALL DEFENDANTS

104.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

105.    This claim arises under 18 U.S.C. §1962(c)-(d) of the RICO Statute, which provides in relevant part:

(c)    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

(d)    It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

106.    At all relevant times, Stifel was a "person" because it was capable of holding a legal or beneficial interest in property.

107.    During the relevant time period, SN&C, SB&T, and the other Sweep Banks were an enterprise engaged in interstate commerce.  Through SN&C, SB&T, and the other Sweep Banks, Defendants knowingly and intentionally devised and operated the Sweep Programs as schemes to defraud investors.  Defendants used the Sweep Programs to enrich themselves and the Sweep Banks by paying unreasonably low interest rates to customers of the Sweep Programs.

108.    Defendants conducted and participated in multiple, related Racketeering Acts for the purpose of implementing the Sweep Programs.  The Racketeering Acts, which occurred, and continue to occur, regularly and continuously during the operation of the Sweep Programs over a multi-year period, constituted a "pattern of racketeering activity."  The Racketeering Acts were made possible by the regular, repeated, and continuous use of the employees, facilities, and services of SN&C.

109.    Defendants' Racketeering Acts included the following indictable, predicate offenses:

(a) **Mail Fraud**: Defendants violated 18 U.S.C. §1341 by sending and receiving materials via U.S. mail and commercial interstate carriers, including the Account Agreement, for the purpose of conducting the fraudulent Sweep Programs scheme, whereby SN&C coordinated with SB&T and the other Sweep Banks to enrich themselves and Stifel by setting unreasonably low interest rates on cash deposited by customers into the Sweep Programs. As described above, the Account Agreement contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of concealing the scheme and defrauding customers.

(b) **Wire Fraud**: Defendants violated 18 U.S.C. §1343 by transmitting and receiving writings and sounds by means of interstate wire communication for the purpose of conducting the fraudulent Sweep Programs scheme, whereby SN&C coordinated with SB&T and the other Sweep Banks to enrich themselves and Stifel by setting unreasonably low sweep interest rates paid to customers. The writings included the Account Agreement, which was posted on Stifel's public websites. As described above, the Account Agreement contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of concealing the scheme and defrauding customers.

110. Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute. Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Programs scheme, including mailing and transmitting the Account Agreement to customers.

111. Plaintiff and the Class suffered damages by reason of Defendants' payment of unreasonably low interest rates on their deposits in the Sweep Programs, in violation of 18 U.S.C. §1962(c)-(d).

112.    Plaintiff's and the Class' injuries were directly and proximately caused by Defendants' racketeering activity.

## COUNT VI

## NEGLIGENCE AGAINST ALL DEFENDANTS

113.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

114.    During the relevant time period, SN&C was the agent of, and investment advisor to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  SB&T also facilitated the Sweep Programs by establishing Deposit Accounts, settling deposits and withdrawals, and collecting fees from unaffiliated banks in connection with the IBD Program. Stifel owned and controlled SN&C and SB&T.

115.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

116.    Defendants' conduct with respect to the Sweep Programs, as described above, was negligent.  By failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs, Defendants breached their duty to act with reasonable care.

117.    Defendants' negligence directly and proximately caused harm to Plaintiff and the Class.

## COUNT VII

## NEGLIGENT MISREPRESENTATIONS AND OMISSIONS AGAINST ALL DEFENDANTS

118.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

119.    During the relevant time period, SN&C was the agent of, and investment advisor to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  SB&T also facilitated the Sweep Programs by establishing Deposit Accounts, settling deposits and

withdrawals, and collecting fees from unaffiliated banks in connection with the IBD Program. Stifel owned and controlled SN&C and SB&T.

120.    Stifel owned and controlled SN&C and SB&T.

121.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

122.    Defendants negligently made material misrepresentations and omissions in the Account Agreement, as described above, which was posted on Stifel's public website.

123.    Plaintiff and the proposed Class justifiably relied on Defendants' Account Agreement and accordingly deposited and maintained cash balances in the Sweep Programs to their detriment.

124.    Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed Class.

## COUNT VIII

## VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349 AGAINST ALL DEFENDANTS

125.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

126.    Defendants' acts and practices with respect to the Sweep Programs, as described above, constituted unlawful, unfair, misleading, and deceptive business acts and practices in violation of §349 of New York's General Business Law ("GBL").

127.    Defendants' misleading and deceptive business acts and practices with respect to the Sweep Programs adversely impacted Plaintiff and the Class, and, therefore, constituted consumer-oriented conduct under GBL §349, which resulted in direct harm to Plaintiff and the Class.

128.    Accordingly, Plaintiff and the Class seek appropriate relief under GBL §349, including injunctive relief and damages.

## COUNT IX

## UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

129.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

130.    Defendants financially benefitted from the unlawful acts alleged herein by paying Plaintiff and the Class unreasonably low and below-market interest payments on their balances in the Sweep Programs.  These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

131.    As a result of the unlawful acts alleged herein, Defendants were unjustly enriched at the expense of Plaintiff and the Class.

132.    Defendants have received, and are holding, funds belonging to Plaintiff and the Class, which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, certifying the Class, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as Class Counsel for the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the Class for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest thereon;

C.    Awarding treble damages in favor of Plaintiff and the Class;

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

- 34 -

E.      Ordering rescission of the Account Agreement and restitution of all fees and other benefits received by Defendants thereunder; and

F.      Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  March 14, 2025                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                          STEPHEN R. ASTLEY #0139254 (FL)
                                          ANDREW T. REES #0062247 (FL)
                                          RENE A. GONZALEZ #1057852 (FL)
                                          SCOTT I. DION #1052005 (FL)


                                               *s/ Stephen R. Astley*
                                          STEPHEN R. ASTLEY

                                          225 NE Mizner Boulevard, Suite 720
                                          Boca Raton, FL  33432
                                          Telephone:  561/750-3000
                                          sastley@rgrdlaw.com
                                          arees@rgrdlaw.com
                                          rgonzalez@rgrdlaw.com
                                          sdion@rgrdlaw.com

                                          ABRAHAM FRUCHTER & TWERSKY LLP
                                          JACK G. FRUCHTER #2520872 (NY)
                                          450 7th Ave 38th Floor
                                          New York, NY  10123
                                          Telephone:  212/279-5050

                                          *Attorneys for Plaintiff*